CHICKASAW COUNTY *v.* GULF, MOBILE & OHIO R. Co.

(In Banc. Oct. 25, 1943.)

[15 So. (2d) 348. No. 35331.]

George Bean, of Okolona, for appellant and cross-appellee.

758

**Fred B. Smith,** of Ripley, for appellee and cross-appellant.

**McGehee, J.**, delivered the opinion of the court.

This appeal involves the question of the alleged validity of a 5-mill tax levied by the board of supervisors of Chickasaw County, in October, 1941, for a ''Food Stamp Loan Warrant,'' and also a 3-mill tax levied for ''Food Stamp Plan and Pauper Maintenance,'' both of said tax levies being in addition to the maximum ad valorem tax of 8-mills authorized by law and imposed by the board at said October meeting for general county purposes under the limitations prescribed by Chapter 104, Laws of 1932 in counties having an assessed valuation of not less than $3,000,000 and not more than $8,000,000.

Appellee railroad company paid its taxes, under protest, in the sum of $2,236.11 collected on the 5-mill tax levy, and the sum of $1,341.66 collected under the 3-mill tax levy, and thereafter filed its claim before the board of supervisors for a refund thereof, setting forth the grounds upon which the validity of such tax levies was being challenged. The claim for each of these amounts having been rejected and disallowed, there was an appeal to the circuit court on an appropriate bill of exceptions, and with the result that said court reversed the decision of the board of supervisors as to the $2,236.11 collected under the 5-mill levy and allowed such refund, but affirmed the decision of the said board in disallowing the refund of $1,341.66 collected under the 3-mill tax levy. From this judgment allowing the refund of the tax collected under the 5-mill levy the county has prosecuted this appeal and the appellee railroad company has taken a cross-appeal as to the disallowance of the refund of the sum collected under the 3-mill tax levy, as aforesaid.

One year prior to making the said tax levies the board of supervisors had considered the matter of cooperating with the Federal Surplus Commodities Corporation, of the United States Department of Agriculture, in putting into effect in Chickasaw County the project known as the "Food Stamp Plan," as provided in Chapter 252, Laws of 1940; and by an order then entered upon its minutes the board declared its intention of thus co-operating to the extent of furnishing the money necessary to create a revolving fund, as required by the said governmental agency and as provided for in the act aforesaid, but specifically declared in such order that its purpose was not to furnish any funds except those necessary to buy the stamps sufficient to put the plan or project into effect, and not to furnish funds for the operation or administration of the said plan in any manner. However, on February 4, 1941, the board entered a further order issuing a negotiable tax anticipation loan note in the sum of $12,000, payable to O. B. Walton and Company, of Jackson, Mississippi, and reciting in said order that at its October meeting, 1940, it had declared its intention to co-operate with the Federal Surplus Commodities Corporation to the extent of not only putting up the funds required for the establishment of a revolving fund but also for the payment of necessary expenses of the said "Food Stamp Plan" after the same had been put into effect, which, under the provisions of the act, would include the lease, equipment, and furnishing of a building or other suitable quarters in which to establish, maintain, and operate a Food Stamp Issuing Office, and to pay for such personnel and help as might be required by the said corporation for the maintenance and operation of the said office, the act providing that the rentals, salaries, and incidental expenses thereof be paid monthly by the counties and cities participating in the said plan, and from their respective treasuries.

The said tax anticipation loan note was made payable March 1, 1942, as provided in said Chapter 252, Laws of

1940, but it was stipulated in the order of the board so providing for the issuance thereof that the same was to be paid ''out of the tax levied for the Pauper Fund, or to be levied for the year 1941,'' since the act under which the said loan note is purported to have been issued 'provides that such a note ''shall be paid out of the first moneys collected from taxes levied and collected for the general fund or pauper fund.'' This order prescribed the form of note to be executed in favor of the said O. B. Walton and Company, and recited that the note ''is issued for money borrowed in anticipation of taxes collected for the year 1941, for the purpose of defraying the expenses of said county during the said year in co-operating in the establishment of the Food Stamp Plan, . . ., and is payable from a special tax to be levied and collected as provided by law.'' The order then further provides that for the prompt payment of the note, the board of supervisors ''does hereby pledge itself and its successors in office to levy and collect a tax for the Pauper's Fund, out of which this note is to be paid, upon all the taxable property in said county for the year 1941, and sufficient for the payment thereof.''

However, when, at its October, 1941 meeting, the board of supervisors made its ad valorem tax levy for the ensuing fiscal year, it undertook to levy, in addition to the eight mills of ad valorem taxes for general county purposes, an item designated as ''For Food Stamp Loan Warrant .............. 5:00 Mills,'' and a further item designated as being ''For Food Stamp Plan & Pauper Maintenance.................... 3:00 Mills.''

Section 1, subd. 8, Chapter 251, Laws of 1940, amending Section 1, Chapter 28, Laws of 1938, Ex. Sess., amending Section 3227 of the Code of 1930, provides, among other things, that the order of the board of supervisors in making its ad valorem tax levy ''shall state all of the purposes for which the general county levy is made, . . . but the rate or levy for any item or purpose need not be shown; and if a county-wide levy is made

for any general or special purpose under the provisions of any law other than section 2, chapter 104, Laws of 1932, each such levy shall be separately stated." Manifestly, in the case before us, both the 5-mill levy and the 3-mill levy were made under the supposed authority of Chapter 144, Code of 1930, to levy such taxes as a Pauper Fund, since there is no authority whatsoever granted in Chapters 251 and 252, Laws of 1940, or elsewhere, for the levy of a special and new tax of five mills or any other mill levy to take care of the "Food Stamp Plan" in co-operation with the Federal Surplus Commodities Corporation of the United States Department of Agriculture; and this is likewise true of the 3-mill levy, which is designated as being for a dual purpose, that is to say, "for Food Stamp Plan and Pauper Maintenance" the latter failing to state separately what portion thereof is for the Food Stamp Plan and what portion is for Pauper Maintenance,—a fact required to be shown by the said Section 1, subd. 8, Chapter 251, Laws of 1940, since it was held in the case, Board of Supervisors of Attala County v. Illinois Cent. R. Co., 186 Miss. 294, 190 So. 241, that any tax levied for the support of paupers is for a special purpose, and not governed by Chapter 104, Laws of 1932, limiting the levy for general county purposes. Moreover, the board had expressly provided in its order directing the issuance of the tax anticipation loan note that it was being made payable out of a special tax to be levied for the Pauper Fund.

In Chapter 144, Code of 1930, it will be found that Section 5695 authorizes the board of supervisors to purchase not more than 160 acres of land for a county home; that Section 5698 provides that such paupers in the county home as may be able to work may be employed by the superintendent thereof in labor; that Section 5699 provides that in case of an emergency temporary relief may be given to a pauper until he can be removed to the county home; and that Section 5701 authorizes the board of supervisors to assess annually and cause to be collected

by the tax collector and paid into the county treasury, such tax as may be necessary for the support of the poor of the county. Thus, we are afforded a declaration of the legislative purpose in authorizing a special tax to be levied for the support of the paupers, as well as a designation of the class of persons entitled to be supported out of a special tax provided therefor; and it will be observed that the tax is for the support of those in the county home and in granting temporary relief, in cases of emergency, until such poor persons can be removed to the home. Moreover, an obligation is imposed by Section 5706, Code of 1930, upon certain relatives to relieve and maintain a pauper.

It is conceded in the case at bar that prior to 1941 it had not been deemed necessary for Chickasaw County to levy a special tax for the support of the poor therein, the expense thereof having been theretofore paid out of the levy for general county purposes. And yet it will be seen that in making its ad valorem tax levy for the fiscal year beginning in October, 1941, there is sought to be imposed on the taxable property in said county a total tax of eight mills as special levies for the Pauper Fund, and which said special levies of five mills and three mills, respectively, on a total ad valorem assessment of $3,-441,623 have resulted in the collection of an aggregate tax of $27,532.97, levied for the purpose of paying a $12,000 tax anticipation loan note.

But it is argued that Section 5701, Code of 1930, authorizing the board of supervisors to assess annually and cause to be collected such tax as may be necessary for the support of the poor of the county, has imposed no limitations upon the amount that may be levied thereunder. A sufficient answer to this contention is that in the absence of an express limitation it is to be implied that the taxing authorities should levy only such an amount as might be reasonably necessary for the support of the poor of the county who are within the class contemplated by said Chapter 144, Code of 1930. The fact

that no fixed limitation is placed upon the amount of the tax to be collected for the Pauper Fund should serve to admonish the taxing authorities not to invoke this power as a means of levying taxes for other purposes under the guise of a fund to support the poor, it being a matter of common knowledge that only a small percentage of those participating in the benefits of the Food Stamp Plan came within the classification of the paupers for whom a special tax levy is authorized under said Section 5701, Code of 1930. The amount of money collected in this instance for the Pauper Fund, as hereinbefore shown, should afford ample support of the view that the law-making power intended that the board of supervisors should levy only such a tax as in its sound discretion was found to be reasonably necessary for the support and maintenance of the class of persons dealt with by this Code chapter in that behalf.

In the case of Gully, State Tax Collector, v. Jackson International Co., 165 Miss. 103, 145 So. 905, 907, the court said: "[Tax] laws are to be strictly construed against the taxing power. The power cannot be implied. All doubts must be resolved in favor of the taxpayer." The power to levy and collect taxes is conferred by statute, and when so conferred, can be exercised only in the manner pointed out by the statute. Mississippi R. Comm. v. Western Union Tel. Co., 107 Miss. 442, 65 So. 505. And this court has uniformly held that tax statutes are construed against the taxing power, and that all doubts are to be resolved in favor of the taxpayer. Gulf & S. I. R. Co. v. Harrison County, 192 Miss. 114, 4 So. (2d) 717.

Chapter 252, Laws of 1940, empowering counties to co-operate with the Federal Surplus Commodities Corporation of the United States Department of Agriculture, in maintaining the food stamp plan of said corporation, contains no provision for the levying of any special or new tax, as heretofore stated. It provides that in any case a county undertaking to so cooperate which "does not have sufficient funds available to create said revolving

fund and to pay said expenses, . . . is authorized
and empowered to borrow from time to time such sums
as will be required to create said revolving fund and to
pay said expenses, and to execute its negotiable note or
notes therefor, to become due and payable not later than
March 1 of the year next succeeding the year in which
said notes are issued. . . . and said notes shall be
paid out of the first moneys collected from taxes levied
and collected for the general fund or pauper fund.''

The term ''general fund'' manifestly has reference to
the 8-mill levy for general county purposes, and the term
''pauper fund,'' evidently, has reference to such fund as
is ordinarily levied in an amount reasonably necessary
to support the poor of the county within the meaning of
Chapter 144, Code of 1930.

If, in order to avoid the requirement of Section 1, subd.
8 of Chapter 251, Laws of 1940, requiring that county-
wide levies made for any general or special purpose shall
be separately stated, it is to be contended that the 3-mill
tax levy ''for Food Stamp plan and Pauper Maintenance''
was for one and the same purpose and need not there-
fore be separately stated, then it should be observed that
the leasing, equipment, and furnishing of a building or
other suitable quarters in which to establish, maintain,
and operate a Food Stamp Issuing Office, and to pay
for the personnel or help for the maintenance and opera-
tion of the office and the stamp plan, has no substantial,
if any, connection with maintaining a home on 160 acres
of land for the poor of the county, and granting tem-
porary relief to such others as are destitute, awaiting their
removal to such home. Indeed, standing room would be
at a premium on the premises of the home for the poor
if the county should undertake to take care of all those
who, as a matter of common knowledge, were permitted
to participate in the Food Stamp Plan, if it is to do so
in the manner contemplated by Chapter 144, Code of
1930, the only statutory authority which has been called

to our attention under which a special tax levy can be made at all for pauper maintenance.

While other grounds are assigned and argued against upholding the tax levies here involved, we are of the opinion that, for the reasons already stated, the decision of the court below was correct in allowing the refund to the appellee in the sum of $2,236.11 collected on the 5-mill tax levy, but that the court was in error in disallowing the refund claimed by appellee in the sum of $1,341.66, collected under the 3-mill tax levy, for which appellee is prosecuting its cross-appeal, and that a judgment should be rendered here in behalf of the cross-appellant also for the refund of the amount last above mentioned.

Affirmed on direct appeal; reversed and judgment here for the cross-appellant on the cross-appeal.

**Anderson, J.,** took no part in this decision.

**Roberds, J.,** and **Smith, C. J.,** are of opinion that the judgment of the lower court should be affirmed both on direct and cross-appeals.